[Cite as *State v. Hall*, 2013-Ohio-4427.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO.  CA2012-01-014 |
| | : | O P I N I O N |
| - vs - | | 10/7/2013 |
| | : | |
| MICHAEL JOHNATHAN HALL, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2010-12-2061


Michael T. Gmoser, Butler County Prosecuting Attorney, Lina N. Alkamhawi, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Jeffrey W. Bowling, 315 South Monument Avenue, Hamilton, Ohio 45011, for defendant-appellant


**RINGLAND, J.**

{¶ 1}  Defendant-appellant, Michael J. Hall, appeals his convictions in the Butler County Court of Common Pleas for three counts of rape.  For the reasons set forth below, we affirm the judgment of the trial court.

{¶ 2}  From 2007 to 2010, the victim, K.G. (born Sept. 1, 2000), lived in Middletown, Butler County, Ohio with her mother and her stepfather, appellant.  On December 18, 2010,

K.G. wrote a note to her mother and placed it on her mother's bath towel while her mother was in the shower. On the outside, the note read "Help me???" On the inside, the note read as follows:

1.    He touches me

2.    He licks me

3.    He takes my clothes off

4.    He makes me do stuff

5.    When I want someone to stay the night I have to let him do it to me!!!

      He told me Brooklyn [K.G.'s cousin who is four years older than her] does it too to make me!! I'm chyred [sic].[1]

      Make him stop!!!

After reading the note, K.G.'s mother confronted appellant and called the police. K.G. was interviewed by Detective Fred Schuemake of the Middletown Police Department and then taken to Children's Hospital in Cincinnati for examination.

{¶ 3}    On January 31, 2011, appellant was indicted on three counts of rape, felonies of the first degree, in violation of R.C. 2907.02(A)(1)(b). Count one alleged that, on or about July 1, 2008, appellant engaged in cunnilingus with K.G. while she was less than ten years of age. Count two alleged that, on or about July 1, 2008 through August 31, 2010, appellant engaged in vaginal intercourse with K.G. while she was less than ten years of age. Count three alleged that, on or about July 1, 2008 through August 31, 2010, appellant engaged in anal intercourse with K.G. while she was less than ten years of age.

{¶ 4}    A three-day bench trial commenced August 23, 2011. At trial, K.G. explained that she had met appellant when she was around five years old and that he lived with her and

---

1. The word "chyred" was later pronounced by K.G. as "scared."

her mother in Middletown, Ohio for several years, but that he did not anymore because she "told on him." K.G. testified that she was ten years old and had never been married to appellant. K.G. stated that appellant "touched" her on her "front butt and [her] butt and sometimes [her] boobs" with "his hands and his front butt." When questioned, K.G. indicated that her "front butt" is her front vaginal area and her "butt" is her buttocks. K.G. described appellant's "front butt" as "a hot dog," though she could not remember if it was hard or soft.

{¶ 5} K.G. testified that, starting when she was seven years old, appellant would put his front butt inside her front butt "all of the time" and he would put his front butt inside her butt "lots of times." She stated that there were times when "juice" that looked "gooey" and "yellowish" would come out of appellant's front butt after it had been inside her. K.G. stated that this "just felt weird" and "really hurt," but that she did not have any bleeding, bruising, or cuts from appellant being inside her. K.G. also testified that appellant put his mouth on her "boobs and that's it."

{¶ 6} K.G. explained that appellant would bribe her saying, "if you do it, I'll let you have a friend over," and she would "sometimes" let him do it. When her friends came over to the house, appellant would not touch K.G. K.G. did not tell anyone about appellant's actions because she was "scared" and "didn't want to get in trouble." However, she decided to tell her mother after she "got mad" at appellant for taking the television's remote control out of her hand and changing the television channel.

{¶ 7} K.G.'s mother next took the stand, testifying that K.G. and appellant initially got along very well, but that K.G.'s behavior began to change when she was eight years old. Specifically, K.G.'s mother testified that K.G. started "looking down" a lot, began overeating, developed headaches and stomachaches regularly, took excessively long showers, and was not very self-assured. K.G. would become upset when her mother would attend night classes at Miami College and K.G. would be left alone with appellant. K.G. also became

verbally and physically abusive with her mother, kicking and yelling if she was not allowed to have people spend the night. In addition, K.G.'s mother began noticing that K.G.'s "underwear were always missing" and K.G. regularly complained that her butt hurt and that she was constipated.

{¶ 8} Due to K.G.'s behavior and medical issues, K.G.'s mother put her in counseling and took her to see a neurologist for her increased headaches and stomachaches. K.G. was also taken to a family doctor because she often contracted urinary tract infections and was occasionally constipated. Even with medical treatment, however, K.G.'s mother testified that K.G.'s behavior did not change until after she gave the note to her mother on December 18, 2010. Since that time, K.G.'s headaches and stomachaches have significantly decreased, she has lost weight, and K.G. has not hit or kicked her mother.

{¶ 9} K.G.'s mother explained that, when she found the note, she became hysterical and confronted appellant. Appellant began to yell at K.G.'s mother and "threw his wedding ring into the bedroom." Appellant then left the house and K.G.'s mother called her mother, appellant's mother, and the police. K.G.'s mother testified that, beyond what was written in the note, K.G. also told her that K.G. watched "dirty movies" with appellant while appellant made K.G. "put his private in her mouth while watching them."

{¶ 10} Dr. Javier Gonzalez Del Rey, a pediatric physician at Cincinnati Children's Hospital, testified that he examined K.G. on December 18, 2010, after her mother brought her in claiming oral, vaginal, and rectal sexual abuse. Dr. Gonzalez Del Rey testified that because they were told the last sexual encounter had happened more than 48 hours prior to K.G. going to the hospital, a sexual assault kit would not have produced any evidence. Therefore, Dr. Gonzalez Del Rey performed a vaginal and rectal examine on K.G. and both exams "were normal." According to the doctor, "there was no evidence of traumatic penetration or lacerations or bruising in the vaginal or rectal area." However, Dr. Gonzalez

Del Rey explained that "28 to 40 percent" of cases of sexual abuse "do not present anything on physical exam."

{¶ 11} K.G.'s medical report from Cincinnati Children's Hospital was then entered into evidence. The medical report contained statements K.G. made to a social worker while at the hospital. According to the report, K.G. told the social worker that appellant "licked her privates and her boobs," "touched her with his front butt," including touching her "inside her privates and inside her butt with his front butt." K.G. described appellant's "front butt" to the social worker as "looking like a hot dog." The report further indicates that these statements were made when K.G. was interviewed alone, outside the presence of her mother.

{¶ 12} Finally, Detective Shuemake of the Middletown Police Department testified that he interviewed K.G. on December 18, 2010, prior to her examination at Cincinnati Children's Hospital. The audiotaped interview between Detective Shuemake and K.G. was played at trial, wherein K.G. stated that appellant had licked her "everywhere." According to Detective Shuemake, K.G. "shook her head yes" when he asked her if appellant had licked her "on [her] privates," "inside [her] privates," and "on [her] bare skin." Detective Shuemake also interviewed appellant the day after K.G. told her mother about the abuse. During this interview, appellant admitted to "licking" K.G. but not in a sexual manner.

{¶ 13} At the close of the state's case, appellant's mother, Susan Hall, as well as appellant, testified. The defense presented evidence that K.G.'s uncle had lived with K.G., her mother, and appellant irregularly from 2008 until 2010. Appellant's mother testified that when the uncle moved out he left behind "sex toys" and "a very bad pornography book." The defense implied that K.G.'s uncle could have been the individual who sexually assaulted K.G.

{¶ 14} Appellant testified that K.G.'s mother physically abused K.G. regularly and K.G. would respond by physically attacking her mother because they "both had demons in them." Appellant testified K.G.'s biological father was becoming more involved in K.G.'s life around

December 18, 2010, and therefore, K.G.'s mother did not want appellant around anymore. As such, appellant believed K.G.'s mother was "telling [K.G.] to say what she's saying." Appellant denied ever having inappropriate contact with K.G.

{¶ 15} On September 9, 2011, the trial court issued a decision finding appellant guilty of all three counts of the indictment. Subsequently, appellant was sentenced on each count to serve 15 years to life in prison with each count to run concurrently to the others.

{¶ 16} From his convictions, appellant appeals, raising two assignments of error.

{¶ 17} Assignment of Error No. 1:

{¶ 18} THE STATE OF OHIO PRESENTED INSUFFICIENT EVIDENCE TO CONVICT [APPELLANT] OF RAPE.

{¶ 19} In his first assignment of error, appellant contends his conviction for rape under count one of the indictment was not supported by sufficient evidence. Specifically, appellant asserts there was no evidence presented at trial that he ever placed his mouth onto K.G.'s "sex organ."

{¶ 20} When reviewing the sufficiency of the evidence underlying a criminal conviction, the function of an appellate court is "to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶ 21} Appellant was found guilty of performing cunnilingus on K.G. while she was under the age of ten in violation of R.C. 2907.02(A)(1)(b). R.C. 2907.02(A)(1)(b) provides, in pertinent part, "no person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * the other person is less than thirteen years of age[.]" The

definition of "sexual conduct" includes "cunnilingus[.]" The act of cunnilingus involves "the placing of one's mouth on the female's vagina." *State v. Sholler*, 12th Dist. Clinton No. CA96-08-013, 1997 WL 208124, *2 (Apr. 28, 1997), citing *State v. Bailey*, 78 Ohio App.3d 394, 395 (1st Dist.1992). *See also State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, ¶ 86 ("[T]he act of cunnilingus is completed by placing one's mouth on the female's genitals").

{¶ 22} At trial, K.G. testified that appellant licked her "on her boobs and that's it." However, at defense counsel's insistence, the audiotaped interview between K.G. and Detective Shuemake was played. In the interview, K.G. states that appellant licked her "everywhere." Detective Shuemake testified that K.G. nodded affirmatively when asked whether appellant licked her "on [her] privates," "inside [her] privates," and "on [her] bare skin." Furthermore, K.G.'s medical report includes statements K.G. made to a social worker that appellant "licked her privates and her boobs."

{¶ 23} K.G.'s testimony at trial does not establish the elements of the crime of rape by cunnilingus. Moreover, there is no video recording of the interview between Detective Shuemake and K.G. Therefore, we are left with Detective Shuemake's testimony that K.G. "shook her head yes" when asked whether appellant licked her genital area and the social worker's report that appellant licked inside K.G.'s genital area. If this evidence were believed by a finder of fact, it would convince the average mind of appellant's guilt. Therefore, we find that the essential elements of the crime of rape by cunnilingus were proven beyond a reasonable doubt and sufficient evidence was presented to support appellant's conviction under count one of the indictment.

{¶ 24} Accordingly, appellant's first assignment of error is overruled.

{¶ 25} Assignment of Error No. 2:

{¶ 26} THE [TRIAL] COURT'S DECISION TO CONVICT APPELLANT ON ALL THREE COUNTS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 27} In his second assignment of error, appellant argues that his convictions on all three counts of rape were against the manifest weight of the evidence. Specifically, appellant contends his convictions must be reversed because there was no physical evidence that K.G. had been raped, she was unable to describe the appearance of appellant's penis, and K.G.'s testimony was unclear as to whether appellant had actually penetrated her vagina or anus.

{¶ 28} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298, ¶ 34; *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶78. In determining whether the conviction is against the manifest weight of the evidence, an appellate court "must weigh the evidence and all reasonable inferences from it, consider the credibility of the witnesses and determine whether in resolving conflicts, the [fact finder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Coldiron,* 12th Dist. Clermont Nos. CA2003-09-078 and CA2003-09-079, 2004-Ohio-5651, ¶ 24; *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. "This discretionary power should be exercised only in the exceptional case where the evidence weighs heavily against conviction." *Coldiron* at ¶ 24; *Gray* at ¶ 78.

{¶ 29} Appellant was found guilty of three counts of rape against K.G. in violation of R.C. 2907.02(A)(1)(b). As stated above, R.C. 2907.02(A)(1)(b) provides, "no person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * the other person is less than thirteen years of age[.]" The definition of "sexual conduct" includes

vaginal intercourse between a male and a female; anal intercourse,

fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A).

{¶ 30} As addressed in our review of appellant's first assignment of error, Detective Shuemake testified that K.G. admitted to him that appellant licked her "everywhere" including her "private parts." K.G. also made statements to a social worker that appellant "licked her privates." While K.G.'s own testimony at trial was contradictory of her statements to Detective Shuemake and the social worker, the finder of fact was in the best position to weigh the evidence, and was free to believe all, some, or none of K.G.'s testimony. *State v. Lewis*, 12th Dist. Fayette No. CA2010-08-017, 2011-Ohio-415, ¶ 12, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). *See also State v. Muhleka*, 2d Dist. Montgomery No. CIV.A. 19827, 2004-Ohio-1822, ¶ 53 (holding that the jury was allowed to consider all, some, or none of the victim's testimony even though she made "minor" contradictions regarding the appearance of the defendant's penis and the timeframe of the abuse). Therefore, we find that appellant's conviction for rape under count one of the indictment was not against the manifest weight of the evidence.

{¶ 31} Regarding the counts of the indictment addressing vaginal and anal rape, K.G. testified that appellant inserted his "front butt" into her "front butt and back butt." K.G. indicated that appellant's "front butt" looked "like a hot dog" and that "juice that was gooey" and "yellowish" came out of appellant's "front butt." Specifically, on cross-examination the following exchange took place:

> Q. Did he put his front butt in anything?
>
> A. My back butt and my front butt.
>
> Q. You're saying he actually put it into your front butt and your

- 9 -

back butt?

A.      Yes.

Q.      You don't remember how that felt?

A.      (Shaking head).

Q.      You said you saw something that looked like juice that was gooey, when did you see that?

A.      I don't remember.

Q.      Was it before he put his front butt inside?

A.      No, after.

Q.      After. Did he push his front butt into your front butt?

A.      Yes.

Q.      And this was hard? Did it hurt?

A.      Sometimes.

Q.      Explain how it hurt.

A.      It just felt weird.

Q.      I didn't hear what you said.

A.      It just really hurt.

{¶ 32} K.G.'s testimony at trial, statements to Detective Shuemake, and report to the social worker, all provide that appellant inserted his penis into her vagina and anus. K.G. repeatedly described the appearance of appellant's penis as a "hot dog." Though K.G., at one point, described appellant's "front butt" as "soft" and later testified that she could not remember whether appellant's "front butt" was soft or hard, we find that the fact-finder did not clearly lose its way in determining that K.G. had adequately described appellant's penis and the sexual acts of vaginal and anus intercourse. *See State v. Waskelis*, 11th Dist. Portage No. 2011-P-0035, 2012-Ohio-3030 (finding that the victim's use of the terms "hot dog" and

"sausage" to describe the defendant's penis were adequate descriptions).

**{¶ 33}** Moreover, the fact that K.G.'s vaginal and rectal medical exams were "normal" is not determinative of whether she was sexually abused. As Dr. Gonzalez Del Rey testified, a large portion of child sexual abuse victims do not have physical signs of abuse. *See State v. West*, 10th Dist. Franklin No. 06AP-11, 2006-Ohio-6259, ¶ 18 (relying on the testimony of a nurse that less than five percent of child sexual assault cases present with physical findings of sexual abuse); *Muhleka*, 2004-Ohio-1822 at ¶ 51 (providing that the fact that there is no physical evidence to prove a defendant had sexual contact with a victim is not determinative, as a doctor testified that, in the majority of child sexual abuse cases, there is no physical finding evidencing the abuse).

**{¶ 34}** "Because the trial court, as the factfinder in this case, had the opportunity to see and hear the witnesses, we must extend substantial deference to its decisions whether, and to what extent, it found each witness credible." *State v. Johnson*, 2d Dist. Miami No. 2001-CA-14, 2002-Ohio-927, ¶ 15. We are mindful that the fact-finder was in the best position to judge the credibility of the witnesses and the weight to be given the evidence. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Based upon the facts of this case, we cannot say that the fact-finder clearly lost its way and created such a manifest miscarriage of justice to warrant a reversal of appellant's convictions. Appellant's convictions for rape were not against the manifest weight of the evidence. Therefore, appellant's second and final assignment of error is overruled.

**{¶ 35}** Judgment affirmed.

HENDRICKSON, P.J., and S. POWELL, J., concur.